STATE ex rel MILLS, et al., Plaintiffs, v.
WILDER, et al., Defendants
(42 N. W.2d 891)
(File No. 9164. Opinion filed June 2, 1950)

**Boyce, Warren, Murphy & McDowell, John S. Murphy, Rex M. Warren,** all of Sioux Falls, for Plaintiffs.

**Sigurd Anderson,** Atty. Gen., **Benj. D. Mintener,** Asst. Atty. Gen., for Defendants.

PER CURIAM. The petition of the plaintiffs for a writ of prohibition restraining the defendants in their respective official capacities as State Treasurer, and Director of Taxation and Licensing from enforcing or attempting to enforce the provisions of Chapter 21, Special Session Laws of 1950 on the ground that said act did not become effective because it was not enacted by a two-thirds vote of the members of both branches of the legislature as required by designated provisions of the constitution of South Dakota, art. 12, § 2, art. 13, § 9, was heard on order to show cause. After full consideration we have unanimously concluded that the contention of petitioners must be sustained. An opinion setting forth the reasons which have induced our conclusion will be filed in due time.

The writ of prohibition will issue.

PER CURIAM. The petitioners prayed for a writ prohibiting the defendants as officers of South Dakota from enforcing the provisions of Ch. 21, Special Session Laws 1950. The theory upon which their petition is grounded is that the cited act attempts to appropriate state revenue for highways and is ineffective because it did not receive the affirmative vote of two-thirds of all the members of each branch of the legislature as required by section 2, Article XII and section 9, Article XIII of the constitution of South Dakota. As will appear from our decision herein filed on May 17, 1950, the petition was granted. The writ was accordingly issued. This opinion is filed to supply a record of the reasoning which induced the conclusion that the questioned act is ineffective.

The act we have under consideration reads as follows:

"Section 1. A tax of two (2) cents per gallon or fraction thereof is hereby imposed on all motor fuel sold or used in this State, but said tax shall be paid but once. The tax herein imposed shall be in addition to the gallonage tax of four (4) cents now imposed by SDC 57.38, as amended, and by the "Use Fuel Tax Act" contained in Chapter 362 of the Session Laws of 1941, as amended, relating to the taxation of motor fuel. The additional tax herein imposed shall not apply to motor fuel used in aircraft.

"Section 2. That the additional tax herein imposed shall become due and payable and shall be reported at the same time and in the same manner as motor fuel taxes provided for by SDC 57.38, as amended, and by the "Use Fuel Tax Act", as amended, and that all of the provisions of SDC 57.38, as amended, and all of the provisions of the "Use Fuel Tax Act", as amended, shall be applicable to the additional tax herein imposed.

"Section 3. That on first day of each month, the State Treasurer shall transfer to the State Highway Fund one (1) cent of every two (2) cents per gallon of the tax collected after the deduction of refunds and expenses of administration and which shall be used by the State Highway Commission for the purpose of matching Federal Aid grants which are now or may hereafter become available, to be ex-

pended in cooperation with the Federal Government in the laying out, marking, constructing and reconstructing of roads and bridges under the jurisdiction of the State Highway Commission.

"On the first day of each and every month the State Treasurer shall apportion one (1) cent per gallon of the additional motor fuel tax collected after the deduction of refunds and expenses of administration and pay over to the various county treasurers in the State of South Dakota, in the following proportions:

"Each county and unorganized county shall receive a sum of such funds in the following proportion: One-third (⅓) in the ratio which the area of each county bears to the total area of all counties in the State; One-third (⅓) in the ratio of rural population of each county bears to the total rural population of all the counties as shown by the last Federal census; One-third (⅓) in the ratio which the mileage of Rural Delivery and Star Routes in each county bears to the total mileage of Rural Delivery and Star Routes in all the counties.

"Section 4. It shall be the duty of the county treasurer to divide said fund between the county and the various organized townships within the county in proportion to the total miles of Rural Delivery and Star Routes under the jurisdiction of the board of county commissioners and the total Rural Delivery and Star Routes under the jurisdiction of the governing boards of the civil townships within the county.

"Section 5. It shall be the duty of the county treasurers of the various counties to credit the pro rata share of his county to the county highway and bridge fund of the county, and shall be used for the purpose of maintaining, laying out, marking, constructing and reconstructing feeder and farm to market roads within the county. The pro rata share allocated to the organized civil townships within the county shall be credited to the special highway fund created by SDC 44.0118, as amended, and shall remain in the custody of the county treasurer and paid out only on warrants issued by the county auditor in payment of claims

approved by the governing body of each civil township. The pro rata share shall be expended within the township for maintenance constructing and reconstructing feeder and farm to market roads within the township, and the pro rata share of the county shall be expended on the county highway system and such secondary highways as may be under the jurisdiction of the board of county commissioners. Provided, that in counties having organized civil townships with no Rural Delivery or Star Routes or no organized civil townships, all of the funds allocated to the county as provided in Section 3 of this Act shall be expended by the board of county commissioners on the county highway system and secondary roads under the jurisdiction of the board of county commissoiners.

"Section 6. The additional two cent (.02) motor fuel tax shall apply to all motor fuel on hand on the effective date of this Act. Within ten (10) days of such date each licensed dealer shall report to the Motor Fuel Tax Section of the Division of Licensing on a form prescribed and furnished by the Director of Licensing the total gallons of motor fuel on hand on the effective date of this Act, and shall file a copy of such report together with remittance of said tax on or before the fifteenth day of the month following the effective date of this Act.

"Section 7. This Chapter shall cease to be in effect from and after July 1, 1951."

The pleadings admit the legislative journals reveal that this act did not receive the affirmative vote of two-thirds of the members of either branch of the legislature. Cf. Barnsdall Refining Corporation v. Welsh, 64 S.D. 647, 269 N.W. 853.

The constitution of South Dakota contains the following provisions, viz.:

"All taxes levied and collected for state purposes shall be paid into the state treasury. No indebtedness shall be incurred or money expended by the state, and no warrant shall be drawn upon the state treasurer except in pursuance of an appropriation for the specific purpose first made." § 9, Art. XI;

"No money shall be paid out of the treasury except upon appropriation by law and on warrant drawn by the proper officer." § 1, Art. XII.

"The general appropriation bill shall embrace nothing but appropriations for ordinary expenses of the executive, legislative and judicial departments of the state, the current expenses of state institutions, interest on the public debt, and for common schools. All other appropriations shall be made by separate bills, each embracing but one object, and shall require a two-thirds vote of all the members of each branch of the legislature." § 2, Art. XII, and "The construction and maintenance of good roads and the supplying of coal to the people of the state from the lands belonging to the state are works of necessity and importance in which the state may engage but no expenditure of money for the same shall be made except by the vote of a two-thirds majority of the legislature." § 9, Art. XIII.

In State ex rel. Parker v. Youngquist, 69 S.D. 423, 11 N.W.2d 84, 86, in considering the sense in which the word "appropriation" is employed in § 2, Art. XII of the constitution, supra, this court said, "An appropriation is legislative sanction for the disbursement of the public revenue. * * The test of whether an act is an appropriation is whether the money may be paid or drawn from the state treasury on authority of the act."

The petitioners read a legislative intention from the act to authorize the withdrawal of money from the state treasury and the expenditure thereof on the highways. Applying the test of State ex rel. Parker v. Youngquist, supra, they assert that the act seeks to appropriate revenue and is rendered ineffective by the two-thirds majority requirement of § 2, Art. XII of the constitution, supra, and further, that as a measure authorizing the expenditure of money by the state on the highways, a two-third majority vote was essential to validity under § 9, Art. XIII of the constitution, supra. Our decision upholds these contentions.

The sole theory of the resistance of the officers of the state to the prayer of the petition is founded on § 8, Art. XI, as amended in 1940 pursuant to Ch. 230, Laws of 1939. The

original section provided: "No tax shall be levied except in pursuant of a law, which shall distinctly state the object of the same, to which the tax only shall be applied." The amendment added these words, viz.: "and the proceeds from the imposition of any license, registration fee, or other charge with respect to the operation of any motor vehicle upon any public highways in this state and the proceeds from the imposition of any excise tax on gasoline or other liquid motor fuel except costs of administration and except the tax imposed upon gasoline or other liquid motor fuel not used to propel a motor vehicle over or upon public highways of this state shall be used exclusively for the maintenance, construction and supervision of highways and bridges of this state."

Their contention is that the proceeds to arise from the act under consideration are appropriated, and the expenditure thereof on the highways is authorized by the foregoing amendment of § 8, Art. XI of the constitution, and that read in the light of this constitutional appropriation, the act is revealed as only a revenue measure which allocates its proceeds among existing funds for which provision is made by SDC 57.3814, as amended by Ch. 277, Laws of 1939, SDC 44.0118, as amended, and SDC 28.0212. According to this contention the "assent of a majority of all the members elected to each house of the legislature" was sufficient, under § 18, Art. III to render the act effective.

Whether the construction they have placed upon the quoted amendment to § 8, Art. XI is admissible is the primary problem presented for solution by the theory of the officers of the state.

▇ A "recurrence to fundamental principles", § 27, Art. VI, Const., seems appropriate. To bend our organic law to the popular will by astute construction is not our function. Our office is to discover and declare the meaning and intention of those who framed and adopted our constitution. Schomer v. Scott, 65 S.D. 353, 274 N.W. 556.

As we have indicated, an amendment is presented for consideration. As an aid to an understanding of the character of change the sovereign people sought to effect by

this added provision, we pause to look at the original sections upon which the petitioners stand.

█ These original provisions do not represent mere legislation enacted to meet the immediate needs of those who adopted our constitution. They are parts of a framework of government then erected with the hope that it would serve throughout the years to safeguard and foster a way of life. Provision, such as appears in § 9, Art. XI, and in § 1, Art. XII, that all state money be placed in the treasury subject only to appropriation by the representatives of the people is a product of long years of bitter experience at the hands of profligate royalty. State ex rel. Birdzell v. Jorgenson, 25 N.D. 539, 142 N.W. 450, 49 L.R.A., N.S., 67; Gamble v. Velarde, State Auditor, 36 N.M. 262, 13 P.2d 559; and 59 C.J. 235, States, § 381. It is intended that the disbursement of public funds shall at all times be subject to the will of the people as expressed by their duly elected representatives. Whether our forefathers foresaw the power of pressure groups may be questioned; that they saw the need to protect themselves against the enthusiasms of. a majority of the legislature will not be questioned. Hence the provision of § 2, Art. XII: "All other appropriations shall be made by separate bills, each embracing but one object, and shall require a two-thirds vote of all the members of each branch of the legislature." A contemporary view expresses the object of this provision in words as follows, "This was doubtless regarded by the framers of the constitution as an adequate guaranty against an unwise or imprudent use of the public funds,—a rule sufficiently flexible to meet emergencies, yet safe and trustworthy, because resting in the conscience and enlightened judgment of so large a proportion of the people's immediate representatives." In re Limitation of Taxation, 3 S.D. 456, 54 N.W. 417, 419.

That this point of view persisted through 1918 is evidenced by the common requirement of several amendments of our constitution. Not only did § 9, Art. XIII, ·supra, adopted in 1916, require a "two-thirds majority" for the expenditure of money for highways, but several other amendments adopted in 1918 involving special expenditures con-

tained a like provision. Cf. §§ 10, 12, 14 and 16, Art. XIII, const.

As a further aid to understanding this amendment some circumstances we are justified in considering should be recalled. 16 C.J.S., p. 68, Constitutional Law, § 30.

Long before 1940 the tremendous and ever-expanding use of the motor vehicle had created an almost insatiable demand for revenue with which to finance the cost of construction, maintenance, repair and reconstruction of highways and bridges. To a sparsely settled state of moderate wealth and great distances, this development presented a bundle of ever acute problems. Not only did the highway program as a whole claim a disproportionate share of our total available revenue, but highways of a particular kind seemed to claim a lion's share of the revenue that could be allocated to highways. A constant competition for financing developed between interests favoring great heavy duty trunk arteries and those whose comfort, convenience and prosperity would be served by the lesser farm to market road. Then again there was competition between sections of the state for better roads. All of this is a matter of common knowledge.

Further, as this use of motor vehicles increased, it was not long before the gas tax was recognized as a most fruitful source of revenue. In 1933, resort was had to this source of revenue to relieve the pressures generated by the recent depression and Rural Credits. Cf. § 16, Ch. 189, Laws 1933. This legislation diverted to Rural Credits bond and interest fund a very considerable sum from this source of revenue which many had come to look upon as belonging to the better roads movement. Then came the 1940 amendment we are considering. The ballot by which it was submitted to the electorate explained its purpose in these words, viz., **"The purpose of the proposed amendment is, and the legal effect of its adoption would be, to make impossible the imposition or use of any license, registration fee or other charge with respect to the operation of any motor vehicle upon any public highways, or the imposition or use of any excise tax on motor fuel used to propel a motor vehicle on the highways, for any purpose other than for the**

maintenance, construction and supervision of highways and bridges of this State." (Emphasis supplied.)

■ That the power rests in the people to appropriate state funds by a provision of their constitution we do not doubt. To warrant a court in so construing a constitutional provision the intention so to do must be clear. 59 C.J. 237, States, § 381. We discern no clear indication that the 1940 amendment was intended for such a purpose.

■ Able counsel has placed great emphasis on the words "shall be used exclusively for the maintenance, construction and supervision of highways and bridges in this state". In a legislative act and under other circumstances, those words might be more significant. We are interpreting a provision of a constitution which deals with a major source of revenue. In the light of history, and the circumstances we have recited, we find it unreasonable to believe the people intended by the 1940 amendment to withdraw from the vast sums to be collected from this source throughout the years the protection afforded against waste and favoritism by the two-thirds vote mechanism originally installed in our organic structure and subsequently so emphasized in the 1916 amendment dealing with highway expenditures. The ballot interpreted the 1940 amendment to mean that the described proceeds could not be used "for any purpose other" than on highways, and we unhesitatingly declare that such was the restrictive purpose of those who framed and adopted that addition to our constitution. So construed, the effect of the amendment is to require payment into the state treasury of all funds derived from the revenue sources described therein but not to operate as a constitutional appropriation. It requires an act of the legislature to permit the disbursement of such funds. A separate bill dealing with highway improvements, not being "the general appropriation bill", must be passed by a two-thirds majority of both branches of the legislature. § 2, Art. XII; § 9, Art. XIII, supra; In re Limitation of Taxation, 3 S.D. 456, 54 N.W. 417; Barnsdall Refining Corporation v. Welsh, 64 S.D. 647, 269 N.W. 853.

■ The secondary problem presented by the theory of the defendant officers deals with the construction of Ch.

21, Special Session Laws 1950, supra. In the absence of such a constitutional appropriation as these officers contend is contained in the 1940 amendment, supra, this legislative act seems unambiguous. We have set it out in full because we think it so clearly expresses the intention of the majority of the members of both branches of the legislature who supported it with their vote. Its meaning does not become less clear when it is read against a background of common knowledge of the urgency of our highway needs. It does not employ the word "appropriation", but counsel are agreed that the clear intention to appropriate may be expressed without the use of that term. The measure was before a special session. It purported only to legislate for the period until further action could be expected from the next regular session of the legislature. Clearly it intended the immediate expenditure of state funds in a broad statewide program of highway betterment. To accomplish its aim, the withdrawal of funds from the state treasury was essential. Hence no other conclusion is possible than that it expresses an intention to appropriate the funds it describes. As a bill for an appropriation for highway expenditures, a two-thirds vote was essential to its passage. § 2, Art. III; § 9, Art. XIII. const.

■■ This disposes of the sole contention of the defendants. We have been delayed in reaching a decision and in giving expression to this opinion because we were mindful that the act in question is also a revenue measure; that a majority vote of the legislature is sufficient to pass such a measure, § 18, Art. XII, const.; and that the doctrine of separability charges us with a duty to uphold any phase of the measure if the legislature would have enacted that much without the part the constitution rejects. Kennedy v. Chicago, M. & St. P. Ry. Co., 28 S.D. 94, 132 N.W. 802. Further, the doctrine of separability, posed the question whether some portion of the described highway program could be saved. To these ends we have devoted time and thought.

A classic expression of the doctrine of separability is taken from Allen v. Louisiana, 103 U.S. 80, 26 L.Ed. 318, as follows: "It is an elementary principle that the same

statute may be in part constitutional and in part unconstitutional, and that if the parts are wholly independent of each other, that which is constitutional may stand while that which is unconstitutional will be rejected. 'But,' as was said by Chief Justice Shaw, in Warren v. Mayor and Aldermen of Charlestown, 2 Gray, 84, 2 Mass. 84, 'if they are so mutually connected with and dependent on each other, as conditions, considerations, or compensations for each other as to warrant a belief that the legislature intended them as a whole, and that, if all could not be carried into effect, the legislature would not pass the residue independently, and some parts are unconstitutional, all the provisions which are thus dependent, conditional, or connected must fall with them.' "

Another profound mind has expressed this view: "Laws are not to be sacrificed by courts on the assumption that legislation is the play of whim and fancy * * *. Our right to destroy is bounded by the limits of necessity. Our duty is to save unless in saving we pervert." People ex rel. Alpha Portland Cement Co. v Knapp, 230 N.Y. 48, 129 N.E. 202, 207.

■ The extent to which courts have gone to save a revenue act has not been overlooked. The bill under consideration is not a general revenue measure; revenue here is a means to a particular end. The end, desired by those who drafted this bill and by those who gave it support, was to initiate an immediate statewide road improvement program. The bill was skillfully drawn so as to invite and marshal support of every character of highway user on that basis. The means and the end are part and parcel of each other. Realities persuade us that a majority of the legislature would not have gone to the extreme of adding a two-cent tax to the existing four-cent tax on motor fuel for the purpose of accumulating revenue to be appropriated by a future legislature. We are also persuaded that the legislature intended nothing less than the statewide program for which the bill makes provision. We are convinced that the bill is not severable. Cf. Barnsdall Refining Co. v. Welsh, supra.

■ As we have indicated this bill did not become a

law because it did not command a two-third majority vote of the members elect of both branches of the legislature. For that reason we issued the writ of prohibition.